## Case No. 10,019.

### The NARRAGANSETT.

[Olc. 246.] [1]

District Court, S. D. New York. Feb. 1846.

COLLISION—WRONGFULLY IN TRACK—CONSEQUEN-
TIAL DAMAGES—STEAMER AND SAIL VESSEL—
LOSS IN ATTEMPTING TO SAVE.

1. If a steamer wrongfully placed herself in the track of another vessel, and in such circum-

1 [Reported by Edward R. Olcott, Esq.]

stances as allowed the other no chance of avoiding a collision, the former is answerable for all the damages which might have been occasioned by her running into the other.

2. In case of collision, the party injured is entitled to recover the actual damages sustained, but cannot claim such as are merely consequential.
[Cited in brief in Austin v. New Jersey Steamboat Co., 43 N. Y. 78.]

3. If a steamer and sailing vessel are approaching each other in such directions that a collision may be reasonably apprehended, it is the duty of the steamer to take proper precautions for avoiding the sailing vessel, particularly so if the latter be close-hauled on a wind.
[Cited in The Cornelius C. Vanderbilt, Case No. 3,235.]

4. In determining the merits in a case of collision, the court will look chiefly to the facts in proof, and will pay but slight attention to the opinions and hypotheses of witnesses, especially those of each ship's company, in respect to the acts of the other.

5. Witnesses upon a vessel in motion, looking at another also in motion, cannot determine by the eye, unaided otherwise, with reliable exactness, either her course, distance or speed.

6. Plans and diagrams, intended to exhibit the courses, bearings and distances of two vessels approaching each other, are of no value as evidence, when framed merely upon the conjecture or opinion of witnesses as to the speed, relative bearing and distances of the vessels.

7. The actual damages sustained by a collision at sea are to be paid by the faulty vessel, both in respect to ship and cargo.

8. The colliding vessel is not exonerated from full damages, because after the wreck a portion of the cargo was injured or lost through the efforts of a third vessel to save it.

In admiralty.

Moore & Havens, for libellants.
Butler & Evarts, for claimant.

BETTS, District Judge. This was a case of collision. The sloop Corinthian, proceeding from New-Bedford to New-York, and the steamboat Narragansett, going in an opposite direction, up the Sound, came in collision on the night of January 8, 1845, in the middle of Long Island Sound, about opposite the harbor of Southport, on the Connecticut shore, in consequence of which the sloop was almost immediately sunk. This action seeks to recover the damages incurred thereby, with the expense of subsequently raising and saving the vessel, and also the damages and loss sustained by her cargo. By the pleadings, each party exonerates himself and imputes all the fault to the other; and the testimony, by persons on the respective vessels, and concerned in their management, is in direct opposition in respect to the acts of the vessels and the cause of the disaster. Their testimony, however, generally consists more in criticisms on the doings on the opposite vessel, than a clear statement of their own acts. The opinions and inferences of witnesses on a vessel under way, in relation to the manoeuvres of another also in motion, afford no satisfactory or reliable evidence of the actual facts of the transaction. This is es-

pecially so, if the occurrence be in the night, and the observations are made when the two are closely approximating each other. Courts accordingly, in this class of controversies, look most sedulously to the facts sworn to, independent of the judgment of witnesses, and in that aspect the knowledge of the witness is usually confined to what was done, ordered, or attempted to be done on his particular ship. It is out of the disaccord and clashing of these statements with the result, rather than the jarring opinions of the respective witnesses, that the court must determine where the fault lay. Twenty witnesses were examined, at large, between the parties on the hearing, and taking in view the pleadings in the case, and giving credit to the testimony of the master and mate of the sloop, and the two pilots and wheelsman on board the steamer, in their statements of any act done by them on board their respective vessels, I find the facts touching the collision of the vessels to be these: That the wind was west by north, light and dying away. That the sloop was deep loaded, and standing on a course about southwest by the compass, holding as close to the wind as she could lay, and was making about three knots the hour. The steamboat was steering east northeast, proceeding at the rate of about ten miles the hour. She had lights set in her bows and aloft, and was first seen from the sloop twenty or thirty minutes before the collision, and was then supposed to be eight or ten miles off. The sloop set a light in her rigging, which was seen from the steamboat one or two miles distance. The sloop held her course without deviation to the instant the collision was seen to be inevitable, and then her helm was thrown hard a starboard, but not in time to make any change in her direction perceptible to those on board. The steamboat, when the light of *the sloop was descried, bore off one point south. The sloop, when next noticed by her, appeared to be coming head on to the steamer, and in the act of striking her at right angles. The wheel of the latter was instantly jammed over, by two men, with a view to wear her off, the vessels coming together nearly at the instant, and before the steamboat had yielded to her helm to any serviceable extent.

This statement of facts, if the case is to rest on them, would clearly prove the steamboat in fault. It was first her duty to take timely means to avoid the sailing vessel, and not press upon her so as to put her in jeopardy or alarm. The Shannon, 2 Hagg. Adm. 173; The Perth, 3 Hagg. Adm. 414. And, moreover, according to all the authorities, and upon the reason of the subject matter, the sloop could rightfully rely upon the steamer using due precaution to avoid her, and adhere to her course, particularly she being close-hauled upon the wind, and it would be incumbent on the steamer to adopt the meas-

ures which would leave her secure. Story, Bailm. §§ 608, 609, 611; The Thames, 5 C. Rob. Adm. 345; The Woodrop-Sims, 2 Dod. 83; The Jupiter, 3 Hagg. Adm. 320; The Chester, Id. 317; The Diana, 1 W. Rob. Adm. 131; The Harriett, Id. 182, 7 La. 222. The officers of the steamer seemed aware of the obligation, and attempt, in their evidence, to clear themselves of blameable conduct in their approach upon the sloop and the collision. Her pilots and wheelsman testify that the sloop, four or five minutes previous to reaching the steamer, changed her course, keeping off to the south, seeing which, the wheelsman says, two minutes before the blow was received, the pilot had seized hold of the wheel, and ordered it shoved hard a port, the sloop having gone off full to the south. Both these witnesses testify that the sloop, when they first discovered her, was off north from them, two points on the weather bow, steering southwest, or west southwest. It is proved that the bowsprit of the sloop, in the act of collision, crossed the deck of the steamboat nearly at right angles at the afterpart of the forward gangway. The latter fact, it is contended, corroborates the evidence of the witnesses that the sloop had changed her course, and they allege that this wrongful manoeuvre caused the collision.

The witnesses on the other side represent the steamboat to have come upon the starboard quarter of the sloop, nearly stem on, and then as she passed by, in clearing her, pressed her round, bearing against the bowsprit, and wrenching it out of its bed and fastenings. The shipwright who repaired the sloop supported this version of the transaction, judging it must be so, from the appearance and place of the wound on the sloop, and the condition of the bowsprit and its fastenings. But the shipwright and others, who examined the steamboat the day after the collision, testify that they could discover no mark on her stem, not even the rubbing of its paint, and, in their opinion, the injuries could not have been inflicted by the striking of her stem against the sloop; but in their judgment the injury resulted in part from her lifting the bowsprit of the sloop out of its place, and chiefly by the wheels of the steamer breaking the timbers and beating in the starboard quarter of the sloop, as the two vessels hung alongside, and were separating from each other, the steamboat being high enough out of water, and having been kept under full way until after the separation of the two.

It does not appear to me, however, that the bearing of these facts authorizes the conclusion that the sloop had previously varied her course, or even if, at the instant, the movement of her rudder had slightly altered it, that she thereby became answerable for the collision. Various diagrams have been exhibited, and computations of bearings and distances have been made to demonstrate that the vessels could not have been brought

in contact under their relative speed and bearings, if, according to the rule of evidence, greatest credit is given to the outnumbering witnesses on the side of the claimants, in those particulars, in which the two classes differ. I confess I place slender confidence in this description of proof. The inferences from it depend wholly on the accuracy of the elements on which the computation is made, and a mis-estimate in trivial particulars of the courses, or distances, or speed of the two vessels, would take away all value from the hypotheses and conclusions upon which the plans are based. For instance, no confident reliance can be placed on the conjecture in this case, that the sloop was two points on the weather bow of the steamer, and one and a half miles off, when first descried from her. It was in the night, the bearings were not taken by compass, and no other examination was made than merely a glance at the sloop. These considerations would prevent the evidence having any important effect, however intelligent and confident the witnesses might be. The main witnesses, in this instance, do not concur in the cardinal facts. The pilot inferred the sloop was one distance, and the wheelsman, observing her at the same moment, judged she was a greater one, the two differing from a half to a mile. In exhibiting the positions of the vessels, on a chart or diagram, those variations necessarily destroy all certainty in the calculations and conclusions attempted to be founded upon them. It is far more satisfactory to reject these surmises and conjectures, and resort to the facts in proof to ascertain with which party, if either, the fault rests.

In my judgment the facts show a want of due precaution and proper management on the part of the steamer on this occasion. The pilot was aware the sloop was approaching him on a fresh wind, at a rate which, coupled with his speed and their short distance, either one or two miles apart, must bring the two vessels across the same line almost instantaneously, for, on his lowest estimate, they were approaching at a conjoined speed of a mile in from two to four minutes. These facts demanded of him the utmost vigilance and alertness, and he was inexcusable in not instantly taking such course as would place both vessels out of danger. So, also, it is clear, upon the testimony of the experienced nautical experts, Captains Thayer and Comstock, examined by the claimant, that it was the duty of the pilot, in the position of the two vessels, to have gone north of the sloop, or to have borne off more than one point, if intending to pass south of her. This should have been manifest to him, for on his own testimony, the bearing of the two was such that if the steamer had not changed her course, she must have come upon the sloop head on, and run her directly under. He regards it a happy movement that he swung off the steamer one point or more, thereby rescuing the sloop from certain destruction by a direct blow. But the proof is clear that the sloop had made no change of her course when the steamer bore off. Her pilot misapprehended the relative position of the two until nearly in the act of striking. Instead of passing her half a mile to the south, as he supposed he should do, by bearing off one point, his course, until that alteration, must have been directly on her, and the only effect probably produced by the change he made was to convert a perpendicular blow into one slightly glancing or oblique. The steamer, then, taking a direction east by north, and the sloop holding about southwest, would, as her stem passed the sloop, bring her beam nearly at right angles with the bow of the sloop, so that the bowsprit of the latter might cross the deck, as asserted by the witnesses who traced the mark. They do not state it to have been exactly at right angles to the steamer's side, but rather oblique towards her stern. Be the angle of contact what it may, I do not accede to the argument of the claimant's counsel that its direction is a demonstration that the sloop must have been heading south, or that her movement was the cause of the collision. Had she been at anchor, the drift and headway of the steamer passing under her bowsprit, might have produced a collision exhibiting the same external marks, though probably with less disastrous consequences. Nor is it of any importance in respect to the rights and liabilities of the two vessels, whether the sloop came into the steamer, or the latter ran upon the former. The steamer had wrongfully placed herself in the sloop's track, under circumstances leaving the latter no means of avoiding her. A collision, thus occasioned, would subject the steamer and owners to the same responsibilities as if the damage had been given by her running upon the sloop.

I do not think it important to discuss the differences between witnesses as to which vessel was to the north of the other when they came in sight, or what their actual bearing might be to each other's bows. I put the case essentially upon this, that the steamboat did not take due precautionary measures to avoid the sloop after it was ascertained the two vessels were running on courses which must bring them speedily across each other's track. In the night time, and in the uncertainty as to the velocity and proximity of the vessels, the duty of the steamboat was to go astern of the sloop, and not attempt to run under her bows; and though her pilot acted under the persuasion he could do it safely, and leave large room to the sloop to pass, the steamer must take the responsibility of the error in judgment, particularly as the claimants are unable to prove the sloop guilty of any fault contributing to the collision. Captain Comstock was called to prove that the mate of the sloop gave a statement of the occurrence, immediately after the collision, in which he admitted the sloop had changed her course, and payed off her sheet, and that the

NARRAGANSETT (Case No. 10,019)                    [17 Fed. Cas. page 1168]

two vessels came together at right angles, the bowsprit of the sloop running into the steamer's beam. The testimony is adverted to now only in elucidation of the justness of the rule which enjoins the strictest caution in acting upon proof of declarations or admissions of parties or witnesses; for although Captain Comstock thus makes the testimony given by the mate, before a commissioner, stand in open contradiction with that declaration, yet it is palpable that Captain Comstock is mistaken in his recollection, and that some other impression on his mind has been substituted for what he heard from the mate. He was employed to attend the examination of the mate before a commissioner, and was, at the time of the conversation, travelling in company with him, for that purpose, and says he paid very particular attention to the whole of his deposition, taken immediately after those admissions; that the mate was a very intelligent man, and seemed honest and candid, and that what he stated upon that examination corresponded exactly with the declarations he had so made to the witness. The impressions he then received, and under such circumstances, would be much more to be depended on than those collected from his memory a year after the event, and without association with a written record, to test the accuracy of his remembrance; and instead of operating as an impeachment of the mate's testimony, amounts to a strong confirmation of its truth.

The libellants are entitled to recover their actual damages incurred by the act of the steamboat, but they cannot claim damages that are remote and merely consequential. The collision caused the vessel and her cargo to sink, and, had they been thus wholly lost, the damages would have been the value of the two. The Iron Duke, 9 Jur. 476. In so far as the libellants have succeeded in rescuing either, to that extent the liability of the respondents is reduced or discharged. There can be no difficulty, under the rule, in adjusting the damages incurred by the sloop itself; she is to be replaced at the expense of the respondents substantially in the condition she was when injured, and the cost of her reparation will ordinarily measure with reasonable certainty, the amount of damage. The same principle applies to the cargo. That portion lost by the collision must be paid for at its fair value, and that rescued is to be deducted at its value as saved (including expenses of saving) from the amount estimated as a total loss. In other words, the libellants take the cargo rescued at its net value, and recover damages commensurate to that not restored.

A question is raised in respect to the liability of the steamer for part of the cargo on deck, which was deteriorated or lost, by the capsizing of the sloop in an endeavor made to tow her into port by the steamer Eureka. It is alleged that the unskillful and improper manner of conducting the salvage caused the loss, and that accordingly it was only consequential to the collision; or if the deterioration or actual loss is chargeable against the steamer, she is not liable for the expenses incurred in recovering that part of the cargo lost overboard on such attempt to save the sloop. I perceive no reason for a distinction in this respect, in favor of the steamer. If the Eureka had committed an act of trespass, or wilful wrong, it might be different. But she found the vessel under water, apparently abandoned, and applied those measures in her aid which seemed best calculated to afford relief. A hawser was carried out to her from the steamer, and efforts were then made to tow her into a harbor. The cargo had so shifted, however, as to render the sloop innavigable; after moving her a short distance, and finding she was careening, the hawser was cut, and the sloop remained under water, most of her deck load having in the operation, gone overboard. I do not think a fruitless effort to save the wreck, made in good faith, and so far as appears with good judgment, though leading, by its failure, perhaps to additional expense and loss to the wreck or cargo, can be regarded as wrongfully causing such damage, and thus exonerating the steamer from it. The mode of saving the vessel and cargo ultimately adopted was doubtless the most efficacious and judicious, but in the absence of the means afterwards obtained and applied, it could not be blameable to try any other at command which afforded a reasonable promise of success. In the then condition of vessel and cargo, those efforts were all apparently for the interests of the claimants. They being liable, in the first instance, for the entire value of both, their loss would be diminished in proportion to the amount of the property saved. Efforts directed alone to the saving of the wreck, although resulting disadvantageously and imposing enhanced expense in its final rescue, do not change the nature of the injury, and substitute a new cause and liability in place of the colliding ship. I shall, accordingly, decree for the libellants, to the amount of the injury done the sloop, the value of the property lost, and the expenses and disbursements necessarily incurred in the salvage of that which was preserved. The particulars will be more conveniently ascertained by a commissioner, and I shall order a reference for that purpose.

[NOTE. The commissioner's report was sustained by the court. Case No. 10,020. The cause was subsequently taken to the circuit court by the claimants on an appeal, from the final decree of the district court as to damages. which decree was affirmed in Case No. 10,017.]